IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MEADE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 20-cv-5293 |
| | ) | |
| v. | ) | Judge Jeffrey I. Cummings |
| | ) | |
| TRAVELERS PROPERTY | ) | |
| CASUALTY CO. OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This diversity lawsuit involves an insurance dispute between insurer Travelers Property Casualty Co. of America ("Travelers") and its insured Meade, Inc. ("Meade"). In 2019, Meade bid for, and won, a contract to install a high-pressure gas pipe in Des Plaines, Illinois but encountered difficult subsurface conditions during installation that resulted in scratching to the pipe's surface. The buyer rejected the pipe, and Meade submitted an insurance claim to Travelers. During Travelers' investigation of the claim, Meade conferred with the buyer regarding its potential options to remedy the damaged pipeline, kept Travelers apprised, and began working on a replacement pipe installation. After several months, Travelers concluded its investigation, determined that coverage would be afforded for Meade's claim, and paid Meade $3,663,266.57 in partial satisfaction of its claim in March and June 2020. Meade thereafter completed the second pipe installation and the buyer accepted it.

After Meade submitted documentation of costs to Travelers, it learned that Travelers viewed the costs from the initial pipe installation as the measure for the replacement pipe costs, and filed this suit on September 8, 2020 seeking the balance of the full ten million dollars allowable under the applicable insurance policy in addition to various "soft costs." (Dckt. #1)

1

Almost a year after Meade filed its complaint, Travelers sought leave to file a counterclaim in which it asserted for the first time that the initial pipe installation was *not* covered by the insurance policy, that Meade breached the insurance policy by pursuing a second pipe installation, and that Meade must return the $3,663,266.57 that Travelers previously paid it. (Dckt. #44).

Both Meade and Travelers have moved for summary judgment on their respective claims. (Dckt. ##128, 129). For the reasons stated below, the Court grants Meade's summary judgment motion in part and denies it in part, and denies Travelers' motion for summary judgment.

## I.        BACKGROUND

### A.  The Initial Project

The following facts are undisputed unless otherwise noted. In the summer of 2019, Meade, an Illinois construction contractor, bid for and won a contract with Kinder Morgan, Inc. ("Kinder Morgan") to install a high-pressure gas pipe "under the heavily trafficked I-90 Jane Addams Tollway northwest of O'Hare International Airport," and below a high-pressure water main which is "the sole source of water to 500,000 consumers in the northwest suburbs," and to insure the gas pipe against damage or loss. (Defendant's Response to Plaintiff's Statement of Facts ("PSOF Resp."), Dckt. #171 ¶¶1, 5, 13, 85). The project involved drilling a borehole and pulling a pipe through it. (Plaintiff's Response to Defendant's Statement of Facts ("DSOF Resp."), Dckt. #173 ¶¶8–9).

Travelers, a Connecticut insurance company, issued a policy of commercial insurance to Meade for the period of May 25, 2019 to May 25, 2020 (the "Policy"). (*Id.* ¶¶1, 2, 5). At the time it issued the Policy to Meade, Travelers' website stated:

> Travelers is an industry leader in risk mitigation for the oil and gas industry. With
> more than 20 years serving oil and gas customers, our underwriting, Claim and Risk

2

Control professionals focus exclusively on the oil and gas industry. We have a deep knowledge of the complex challenges and risks that could . . . damage property or jeopardize the success of your operation.

(PSOF Resp. ¶53). The Policy specifically states that Travelers "will pay for direct physical loss of or damage to Covered Property." (*Id.* ¶31). "Covered Property" is defined as "Installation" at a "jobsite" including "Gas main installation." (*Id.*).

Because of physical subsurface conditions inherent to the drilling industry (i.e., rock, gravel, etc.), scratching is expected during the pullback process (i.e., when the pipe is pulled through the borehole). (DSOF Resp. ¶¶10–11). To protect against scratching, two protective coatings are applied to pipes: fusion bonded epoxy and a Powercrete Abrasion Resistant Outercoating. (*Id.* ¶15). Furthermore, federal law requires all new buried hazardous pipelines to use cathodic protection—a process whereby an electrical current is put on the pipe to prevent metal loss. (*Id.* ¶¶16–17).

During the bidding process, Kinder Morgan delivered geotechnical information via soil boring logs to the prospective bidders, which provided information to enable the bidder's design team to properly prepare protocols to avoid or minimize scratches or gouges on the pipes being pulled through the borehole. (*Id.* ¶13). Kinder Morgan provided six soil borings to the bidders, including Meade, three of which were taken in 2019 and three of which were taken in 2010. (*Id.*). Meade won the project bid and the estimated project price was $3,914,865. (*Id.* ¶19).

## B. Unexpected Drilling Conditions

Meade started drilling and encountered difficult subsurface conditions which resulted in a sinuous (i.e., twisting or serpentine) pilot bore and the pipe installation experienced scratching that penetrated the two protective coatings and exposed bare metal. (*Id.* ¶¶20, 34, 67). In response to the unexpected subsurface conditions, Meade widened the diameter of the borehole

3

from forty-eight inches to fifty inches, but the widened borehole "apparently followed the sinuous path pioneered by the pilot [borehole], resulting in significant sinuosity of the larger bore." (PSOF Resp. ¶67). Meade approached Kinder Morgan about the possibility that the bid documents failed to present an accurate picture of the ground conditions, but Kinder disagreed and did not entertain any additional compensation, even though the subsurface conditions increased Meade's costs to $7,323,210.90. (*Id.* ¶¶26–29, 30). The parties agree that the "failure to provide a representative picture of the subsurface, and particularly in regard to the amount of cobbles in the soil is the origination of the scratches and gouges on the pipe that occurred during the Project." (DSOF Resp. ¶38).

The resulting installation caused damage: in particular, both layers of protective coating were scratched off and bare metal was exposed for the length of the pipe that was pulled through the borehole. (PSOF Resp. ¶¶103–04). Ultimately, Kinder Morgan rejected the initial pipe in August 2019 because of its scratches, claiming that its "long-term integrity" and "potential corrosion" made the pipe unusable. (DSOF Resp. ¶¶40, 42). In September 2019, Meade informed Travelers and its consultant, Zimmer, that there were four potential options regarding the damaged pipeline. (PSOF Resp. ¶41). While increased cathodic protection was proposed as a solution for the damage to the initial pipe, Kinder Morgan rejected this suggestion, and Travelers was aware of both the suggestion and rejection. (*Id.* ¶¶54–55). Kinder Morgan determined that the only solution to move forward was for Meade to perform the installation of a replacement pipe through a new bore.[1] (DSOF Resp. ¶44).

---

[1] Travelers, in reliance on its expert, now asserts that the initial pipe was salvageable. (DSOF Resp. ¶39). Meade disputes this, and states that Travelers' expert report is inadmissible. (*See* Dckt. #178 ("PSAF Resp."), ¶¶126–130). The Court need not determine admissibility of the expert report at this juncture because the opinion of Travelers' expert is immaterial to the Court's resolution of the parties' cross-motions for summary judgment.

## C. The Replacement Pipe

Travelers was aware that Meade was working to install a replacement pipe for Kinder Morgan after Kinder Morgan rejected the initial pipe, and Travelers was apprised of the status of the welding, coating, and installation of the replacement pipe through Meade's updates and Travelers' own site inspections. (DSOF Resp. ¶¶45–52, 56). To prepare for the installation of the replacement pipe, Meade followed Travelers' advice from the March 19, 2020 Coverage Commitment Letter, described *infra* at Section I(E), and had additional geotechnical borings drilled, which presented different soil conditions than those provided by Kinder Morgan during the initial bidding process. (DSOF Resp. ¶45). To reduce exposure of bare metal, Meade increased the bore size for the second installation from fifty inches to fifty-four inches, thereby increasing the space between the pipe and the bore wall. (*Id.* ¶¶46–47).

After completion, the second pipe suffered from scratching down to the metal, but Kinder Morgan nonetheless accepted the pipe. (*Id.* ¶52). According to Kinder Morgan, "the amount of bare pipe that was exposed on the first drill was significantly more than any bare pipe that we saw on the second drill." (*Id.*). Furthermore, Kinder Morgan explained that there were two differences between the installations:

> One, they ran a tool through the line to verify that it was just intermittent coating issues on the pipe and that we didn't have a significant coating issue like we did, no coating missing like we did on the first one. And then secondly, we had an anode which would be the first drill, sacrificial pipe[] that went for the whole length of this pipe that could be used to protect the second drill. And so there was a much better comfort level that the pipe could be fully protected even with some intermittent coating missing.

(PSOF Resp. ¶104). Finally, the issue was "not just how much of the pipe's metal was stripped, but where the pipe was stripped," because the initial pipe "was stripped to bare metal on the

longitudinal weld, which is the most vulnerable part of the pipe."[2] (*Id.* ¶99). Prior to accepting the second pipe, Kinder Morgan used a "smart pig"—a pipeline integrity gauge—to "verify that it was just intermittent coating issues on the pipe" unlike the initial pipe that had "a significant coating issue" with "coating missing." (DSOF Resp. ¶53, *quoting* Dckt. #131-8 at 32). Kinder Morgan never used a smart pig on the initial pipe because, according to Kinder Morgan, "the visible damage . . . 'was so severe that [Kinder Morgan] didn't deem it necessary.'"[3] (PSOF Resp. ¶106).

### D. Meade's Claim and Travelers' Investigation

On September 9, 2019, Meade submitted a claim under the Policy for the initial pipe's damage and Travelers assigned it to Steven Siemann, a general adjustor. (PSOF Resp. ¶¶34, 36). Meade was an active participant in the claims process and investigation. As part of the claims process, Meade provided Travelers with the geotechnical reports from the bidding process, daily logs from the pipe pullback process, and construction and bid drawings, among other documents. (*Id.* ¶40). Within days, Travelers engaged J.S. Held and ESI as consulting firms to assist with Meade's claim and to conduct, among other things, engineering peer review. (*Id.* ¶¶36, 63). Travelers paid the consulting firms at least $134,241.44 in relation to their work investigating Meade's claim. (*Id.* ¶77).

---

[2] Travelers disputes this fact based on it being "an opinion, not a fact." (PSOF Resp. ¶99). However, opinion testimony by a lay witness is admissible. *See* Fed.R.Evid. 701 (admissibility of opinion testimony by lay witnesses); *United States v. Bogan*, 267 F.3d 614, 619 (7th Cir. 2001) (affirming the admission of lay opinion testimony under Rule 701 that was rationally based on the witness's observation of an incident). The fact is thus deemed admitted.

[3] Travelers disputes this fact because "the visible damage on the Initial Installation was so severe" is an opinion and not a fact. (PSOF Resp. ¶106). But, again, a lay witness may testify to opinions rationally based on his observations. *See supra* note 2. This fact is thus deemed admitted. *See Bogan*, 267 F.3d at 619.

By letter dated October 22, 2019, Travelers advised Meade that it was investigating the claim, writing:

> [Travelers] has been unable to determine whether your claim is covered under your policy based on the information available to us at this time. . . .
>
> It is our understanding the pipe installation was verbally rejected by the owner's representatives at the loss site. We have not been provided with a basis for this rejection or any documentation which addresses how the current condition of the pipe exceeds the accepted tolerance of damage.
>
>                                     * * *
>
> While the policy must be read as a whole, we now refer you to some important language from your policy that may affect coverage for your claim. Please refer to pages 9 through 11 of 24 of your IM Pak Coverage Form, CM Tl 43 08 96, which in part states:
>
> B. EXCLUSIONS
> . . .
> 3. We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause of Loss results, we will pay for that resulting loss or damage. . . .
>
> h. Omission in, or faulty, inadequate or defective:
>
>> (1) Planning, zooming, development, surveying, siting, design, or specifications; or
>>
>> (2) Materials, workmanship or maintenance. This exclusion applies only to "installation".
>
> Given the different degrees of gouging and/or other damage to the various sections and/or surfaces of the pipe length(s), our engineering consultant has advised us that it appears possible the pipe at issue may not have met the specifications published by the manufacturer and/or the specifications of the project, the specifications of the project may not have met the requisite standards for an installation of this type, and/or the work may not have been performed in accordance with the project specifications and/or executed utilizing proper protective measures. Please note, also, that it appears the pipe and its installation - i.e., both the work and the product might have been faulty. . . .

(*Id.* ¶46).

Travelers' investigation continued and, during a February 2020 teleconference between Travelers' personnel, Siemann reported that ESI's finding indicated that the geotechnical borings

"did not accurately describe the condition of the soil" and that "[l]arger bores should have been taken to capture the cobbles in the till. They did not properly characterize the subsurface [and only] mentioned traces of gravel." (*Id.* ¶63).

On March 11, 2020, after approximately half a year of investigation, J.S. Held submitted a summary of its findings to Travelers and concluded:

> [I]t is our opinion that Meade met the spirit of their contract. The pipe material and coatings provided by Kinder Morgan were sufficiently designed and fabricated. Although, Meade's buoyancy control methods deviated from their pull back and lift plan, they did take action during pullback to monitor and adjust as necessary.
>
> It is our opinion that the geotechnical due diligence performed by Kinder Morgan's consultant did not reflect the existing conditions that could have been reasonably anticipated. The glacial till and cobble soil conditions which are identified in industry guidelines as "potential show stoppers" were not sufficiently communicated at bid time, nor were they reflected in the engineered contract drawings.
>
> Meade, upon discovery of essentially a changed site condition, adjusted their reaming plan to successfully bore through the challenging soil conditions without impacting adjacent utilities. It is possible that using a 54" reamer which meets industry guidelines would have created a hole with more lateral tolerance, but this might not have been an option due to the adjacent 90" water main. Although the pipe was pulled back successfully, the scratches on the coatings rendered it unacceptable to Kinder Morgan. It is our understanding that Meade proposed alternate solutions to salvage the installed pipe (i.e. cathodic protection, etc.), but they were rejected by Kinder Morgan.

(*Id.* ¶65). The next day, March 12, 2020, ESI submitted its findings to Travelers:

> During installation, the pipeline suffered significant scoring to both the abrasion-resistant coating and to the pipeline itself that resulted in rejection of the installation by [Kinder Morgan].
>
> ESI's findings, based on a review of project documents, published geologic maps and reports, HDD [Horizontal Directional Drilling] guidelines and best practice recommendations, and discussion with the drilling contractor (Meade, Inc.), are as follows:
>
> 1.     Information provided in the bid and construction packages relied upon by Meade did not provide a representative picture of the subsurface conditions to be encountered by the HDD bore. Specifically, these documents 1) did not contain a

narrative concerning the anticipated nature of the subsurface materials (glacial outwash and till overlying dolomitic bedrock); and 2) did not contain subsurface boring data representative of the subsurface conditions in the area. Specifically, all the data provided came from small diameter borings which generally failed to detect or report the presence of cobble and larger-size materials, a condition that resulted in difficulties in drilling and damage to the pipeline during installation.

2.   The presence of strong (high strength and Mohs hardness) cobbles and boulders in the till resulted in a sinuous pilot bore through these materials. Meade used various cutting and reaming tools to then widen the pilot shaft to a final bore diameter of about 50 inches (in). Though consistent with best practices for HDD drilling, (which recommend a hole diameter of at least 12 inches larger than the diameter of the transmission pipeline, i.e., 50 in. > 36 in + 12 in = 48 in), the larger bore apparently followed the sinuous path pioneered by the pilot, resulting in significant sinuosity of the larger bore.

3.   Based on information provided by Meade, the pipeline was pulled with a combination of mud weight (11.5 lb/gal), and added water (63,000 gal), that rendered the pipeline neutrally buoyant during much of the pull, generally consistent with recommendations provided by their sub-consultant (GeoEngineers, Inc.).

4.   Damage to the pipeline occurred during pulling as a result of localized frictional encounters between the pipeline and strong, sharp-edged cobbles and boulders embedded in the till. These interactions principally occurred where the relatively inflexible pipeline was threaded through and rubbed against the walls of the sinuous bore.

The mitigation of damage in this setting likely could only be accomplished by drilling a bore significantly larger in diameter to the 50-inch bore used in this case.

(*Id.* ¶67).

As part of Travelers' investigation, it reviewed an "expansive set of documentation from before, during, and after the initial bore was completed" and relied on experts from the "directional drilling/boring industry, construction cost experts, and materials engineers to evaluate the circumstances of the loss." (*Id.* ¶76). The investigation concluded that "the Insured took reasonable measures to drill and install the pipe in keeping with the minimum standards in the drilling industry." (*Id.*).

### E. Travelers' Coverage Commitment

Following its months-long investigation, Travelers prepared a "Coverage Commitment Letter" and the letter was reviewed, edited, and approved by multiple Travelers personnel, including Director of the Major Case Unit W. Wade Ledbetter, Executive General Adjustor of the Property Major Case Unit Howard Yesnes, and in-house counsel Ginta Grenier. (*Id.* ¶¶70–71).

On March 19, 2020, Travelers sent the approved Coverage Commitment Letter to Meade and represented that it "completed its cause of loss investigation"[4] and that "coverage for this claim will be afforded." (PSOF Resp. ¶72). The Coverage Commitment Letter further stated that Travelers' "investigation has been unable to locate sufficient evidence to support application of the exclusions that were cited in Travelers' October 22, 2019 reservation of rights letter." (*Id.*). As such, Travelers reported to Meade that it was "prepared to review and verify the costs associated with the claim as they become available so that payment for the covered damages may be issued." (*Id.*).

The Coverage Commitment Letter further stated:

Travelers' investigation of the original 2019 installation was undertaken for the sole purpose of determining whether the damages to the pipe during the original 2019 installation would qualify for coverage under the terms of L & H's policy. Travelers has not undertaken and will not undertake any technical, feasibility, safety or other review of the original 2019 installation or the new installation that we understand is in process. That said, while our investigation may not have identified a definitive omission, inadequacy, defect or fault in the planning, siting, design and/or workmanship process(es), the likely reason(s) for the damage to the initial pipe during the original 2019 pipe installation are now known. Thus, it is incumbent upon L & H [Meade's parent company] to take any and all measures available to avoid any risk of similar damage to the new pipe during the new installation. This may include, but not be limited to, ensuring sufficient, additional borings to ascertain subsurface conditions in and around the drilling area with greater certainty, ensuring appropriate geotechnical and/or engineering consultation in the event of difficulties encountered during drilling, boring and/or swabbing, and/or

---

[4] Notwithstanding this representation, Travelers asserts in this lawsuit that its investigation of Meade's claim was still on-going at the time it issued its Coverage Commitment Letter to Meade. (DSOF Resp. ¶57).

ensuring the new bore is of adequate diameter and sufficiently straight so as to avoid damage when the new pipe is pulled.

Should similar damages occur to the new pipe during the new installation they would not be considered a fortuitous loss under the L & H policy. L & H now knows of the presence of glacial till, cobbles and boulders in and around the job area, has experienced drilling, boring and/or swabbing complications occasioned by the presence of these undesirable subsurface conditions in and around the job area, and knows that the adjustments made during the original 2019 installation were not sufficient to keep the initial pipe safe from damage. Thus, any future claim for similar damages to the new (replacement) pipe would likely be subject to various exclusions under the policy.

(*Id.*). Finally, the letter included the following:

This letter should not be construed as a waiver of any of the rights Travelers may have under the terms of your insurance policy or at law, ***including our right to dispute and/or exclude costs not specifically covered by your policy.*** All rights which Travelers may have under the terms of your insurance policy and at law are specifically reserved.

(*Id.*) (emphasis added).

When the Policy came up for renewal, Travelers, by its March 20, 2020 letter, advised Meade that it had added an endorsement to the renewal policy that would be effective for any future claims limiting certain underground losses to $2.5 million (instead of $10 million, as in the Policy) and applying a $50,000 deductible. (*Id.* ¶73).

On March 22, 2020, Travelers' consultant, Zimmer, went to inspect the work site. (*Id.* ¶74). In her Daily Field Report for March 22, 2020, which she attached to a March 23, 2020 letter to Travelers' Siemann, Zimmer reported to Travelers that the new pipe was pulled back and that "[s]ome scratches to the ARO coatings could be observed" and Zimmer made a note of this fact on a photograph of the pipe. (*Id.*).

On March 27, 2020, Travelers internally circulated a "Property Large Loss Report," which stated, *inter alia*,

Loss Facts:

11

Our investigation included review of an expansive set of documentation from before, during, and after the initial bore was completed. We utilized consulting experts from the directional drilling/boring industry, construction cost experts, and materials engineers to evaluate the circumstances of the loss. ***Upon completion of our investigation we concluded that the Exclusions cited in our Reservation of Rights letter did not apply to the claim as the Insured took reasonable measures to drill and install the pipe in keeping with the minimum standards in the drilling industry.*** We also completed materials engineering assessments on the pipe, and its coatings, and determined that they met the specifications to which they were designed. ***As such, coverage is afforded for this loss.***

(*Id*. ¶76) (emphasis added).  Travelers also recognized that the initial pipe was not salvageable because it could not be repaired to serve its "intended use as a natural gas transmission line," nor could the initial pipe be removed "due to concerns that the bore might collapse and undermine a large (90+ inch) water main which runs above it." (*Id.*).  The Large Loss Report further articulated that Travelers was "able to identify the Insured's incurred costs up to the point that the damage to the pipe occurred," and developed an estimate of seven million dollars for costs to restore the insured to its pre-loss condition. (*Id.*).  Travelers noted that Meade would provide documentation for incurred costs related to the initial installation as well as drilling and placement of the replacement pipe and that Travelers would "review this documentation under the policy's Installation Coverage and Additional Coverages to determine the final amounts owed." (*Id.*).

### F. Travelers' Advanced Payments to Meade

On March 30, 2020, Travelers sent Meade an advance payment of one million dollars. (PSOF Resp. ¶79).  On April 8, 2020, Travelers received Meade's value of the claim in the amount of $10,816,439.54.  (DSOF Resp. ¶78).  On June 11, 2020, Travelers issued another advance payment to Meade of $2,663,266.57, for a total of $3,663,266.57 in advance payments. (PSOF Resp. ¶80; DSOF Resp. ¶56).  On June 15, 2020, Meade then submitted an updated claim for $14,446,679.65.  (PSOF Resp. ¶81).  By June 29, 2020, J.S. Held confirmed that Meade

provided evidence of costs (such as invoices) for $11,438,192.80, but that not all costs were recommended for reimbursement under the Policy.  (*Id.* ¶82).  As of July 13, 2020, Meade represented that it provided all invoices and charges to Travelers.  (*Id.* ¶83).

Despite its internal Large Loss Report stating that the "Insured will incur additional costs in material and labor for the installation of the replacement pipe into a new bore they are drilling nearby," such as "[c]osts related to planning, engineering, soil evaluation and working during the winter," Travelers sent Meade a July 16, 2020 letter which represented that Travelers "asserted that the 'initial installation costs serve as a measure for the replacement of the damaged pipe.'" (*Id.* ¶107).  Travelers did not make any further payments to Meade beyond the $3,663,266.57 in advanced payments that it paid in March and June 2020.

### G.  This Litigation

On September 8, 2020, Meade filed its complaint in this case seeking the balance of the full ten million dollars allowable under the applicable insurance policy in addition to various "soft costs."  (Dckt. #1).  Travelers filed its answer and affirmative defenses on November 17, 2020.  (Dckt. #12).  Notably, Travelers did not deny that it sent the March 13, 2020 Insurer's Coverage Commitment Letter to Meade; it did not plead a counterclaim for the return of the advance payments it made to Meade; two of its four affirmative defenses asserted limitations to the costs that Meade was entitled to recover under the Policy; and the other two affirmative defenses asserted boilerplate conditional defenses to liability under the Policy.[5]  (*Id.*).  The parties thereafter engaged in written and deposition fact discovery; fact discovery was scheduled

---

[5] For example, Travelers' fourth affirmative defense cited a list of duties imposed on Meade to obtain coverage (such as providing prompt notice of the loss, giving a description of how the loss occurred, not assuming any obligation or incurring any expense without Travelers' consent, allowing Travelers to inspect the property to assess the loss, and cooperating with Travelers' investigation (Dckt. #12 at 17-18)) that Meade—as discussed above—indisputably complied with.  (*Supra* at Sections I(C)–(E)).

to close on September 3, 2021; and a schedule for the completion of expert discovery and for filing dispositive motions was set, (Dckt. #29). Meade served Travelers with 137 requests to admit facts and the genuineness of documents that Travelers answered on August 25, 2021.[6] (Dckt. ##31; 34 at 4).

One day later, on August 26, 2021, Travelers sought leave to file a counterclaim in which it asserted for the first time that the initial pipe installation is *not* covered by the insurance policy; that Meade breached the insurance policy by pursuing a second pipe installation; and that Meade must return the $3,663,266.57 that Travelers previously paid it. (Dckt. #44). Over Meade's objection, Judge Wood (who was then presiding over this case) granted Travelers' leave to file its counterclaim on December 21, 2021. (Dckt. #43). The parties thereafter engaged in additional fact discovery, motion practice, and expert discovery prior to filing the motions for summary judgment that are presently before the Court.

## II. LEGAL STANDARD

Summary judgment is appropriate when the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024); *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 584 (7th Cir. 2021) (the existence of a factual dispute between the parties will not preclude summary judgment unless it is a genuine

---

[6] Meade served these requests for admission in preparation for filing a motion for summary judgment without the need for further discovery. (Dckt. #34 at 4).

dispute as to a material fact); *Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004) (issues of material fact are material if they are outcome determinative).

When the moving party has met that burden, the non-moving party cannot rely on mere conclusions and allegations to concoct factual issues. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Instead, it must "marshal and present the court with the evidence [it] contends will prove [its] case." *Goodman v. Nat. Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). In determining whether a genuine issue of material fact exists, all facts and reasonable inferences must be drawn in the light most favorable to the non-moving party. *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). Ultimately, summary judgment is granted only if "no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (cleaned up). Where (as here), cross-motions for summary judgment have been filed, courts "construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made." *Calumet River Fleeting, Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*, 824 F.3d 645, 647–48 (7th Cir. 2016) (cleaned up).

## III. ANALYSIS

Meade brings a single breach of contract claim, seeking to hold Travelers liable for the remaining coverage due under the Policy. Travelers' counterclaims seek the opposite—namely, in Count I, a declaratory judgment that it is not liable for coverage under the Policy; in Count II, Travelers asserts a breach of contract claim, alleging that Meade misrepresented its knowledge prior to performing its drilling project and knew or should have known that difficult subsurface conditions were present and did not perform in accordance with such conditions; and, in Count III, in the alternative to its breach of contract claim, Travelers alleges that Meade was unjustly

15

enriched by Travelers' partial payment for the initial pipe's installation. For the following reasons, the Court finds that Travelers is estopped from denying coverage to Meade for its claim. Therefore, the Court denies Travelers' motion for summary judgment,[7] grants Meade's motion for summary judgment as to liability on its breach of the policy claim, and denies the remainder of Meade's motion as to damages.

## A. Travelers Is Estopped from Denying Coverage.

Fundamentally, the parties disagree as to whether Meade's claim for the pipe installation is covered under the Policy. To be clear, Travelers did not dispute coverage until Summer 2021—over a year after sending the Coverage Commitment Letter—when it moved to file a counterclaim in this case, (Dckt. #32). When doing so, Travelers claimed that "information was disclosed in discovery" that caused Travelers to believe that "the scratches on the pipe in the first installation did not constitute a loss because the pipe could have been salvaged . . . as there will always be certain damage to a pipe being pulled through a bore hole and because Meade had actual or constructive knowledge of the subterranean conditions it encountered before it bid on the Project and before it pulled the pipe through the hole it bored." (*Id.* ¶8).

Meade presents multiple arguments in response to Travelers' belated coverage position: namely, that Travelers is estopped from denying coverage or otherwise waived the argument; and that Travelers' argument is barred by laches, the "common law voluntary payment doctrine,"

---

[7] Travelers asserts that it is entitled to restitution of the advance payments it made to Meade under an unjust enrichment theory because Meade received benefits under the Policy to which it was not entitled. (Dckt. #170 at 22). Because Travelers' contract and declaratory judgment claims fail, its unjust enrichment claim fails as well. *See Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) ("[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim – and, of course, unjust enrichment will stand or fall with the related claim.").

16

and/or the "mend the hold doctrine." (Dckt. #165 at 5–9). The Court finds merit in Meade's estoppel argument, and it therefore need not address the remainder of Meade's arguments.

Estoppel "prevents the assertion of a contractual condition by a party who, through words or conduct, has fostered the impression that the condition will not be asserted as a legal defense." *Ankus v. Gov't Emps. Ins. Co.*, 674 N.E.2d 865, 867 (Ill.App.Ct. 1996) (cleaned up). "To establish estoppel in an insurance context, the insured must show: (1) that he was misled by the acts or statements of the insurer or its agent; (2) reliance by the insured on those representations; (3) that such reliance was reasonable; and (4) detriment or prejudice suffered by the insured based on the reliance." *Dumenric v. Union Oil Co. of Calif.*, 606 N.E.2d 230, 233 (Ill.App.Ct. 1992). "An *intent* to mislead the relying party is not necessary for recovery." *Id.* (emphasis added). "Cases in which an insurer is estopped from denying coverage typically involve a concession of liability by the insurer, advance payments made by the insurer, or statements made by the insurer that encourage the plaintiff to delay filing his action." *Ankus*, 674 N.E.2d at 868; *Lumbermen's Mut. Cas. Co. v. Sykes*, 890 N.E.2d 1086, 1102 (Ill.App.Ct. 2008); *Myers v. Centralia Cartage Co.*, 419 N.E.2d 465, 468 (Ill.App.Ct. 1981) (citing multiple cases).[8]

"Summary judgment on the matter of estoppel is appropriate where the undisputed material facts would lead a reasonable mind to only one conclusion," *Lumbermen's*, 890 N.E.2d

---

[8] Travelers contends that estoppel cannot be applied to "create primary coverage or increase coverage provided under an insurance policy." (Dckt. #170 at 13). This is only partially correct. As the Seventh Circuit has explained, Illinois recognizes two forms of estoppel: "general" (or contractual) estoppel and "equitable estoppel." *Essex Ins. Co. v. Blue Moon Lofts Condo. Ass'n*, 927 F.3d 1007, 1012–13 (7th Cir. 2019) (citing cases). Although general/contractual estoppel cannot be used to create primary coverage or to increase coverage under an insurance policy, (*id.* at 1012), equitable estoppel "can force an insurer to do what general estoppel cannot: pay for a claim that falls outside the terms of the insurance policy." *Id.* at 1013 (citing *Illinois Sch. Dist. Agency v. Pac. Ins. Co.*, 471 F.3d 714, 719 (7th Cir. 2006)); *see also Nat'l Discount Shoes, Inc. v. Royal Globe Ins. Co.*, 424 N.E.2d 1166, 1169 (Ill.App.Ct. 1981) (recognizing that "courts have frequently employed the doctrine of implied waiver or estoppel to bar an insurer from relying on the defense of non-coverage."). Because Meade is relying on equitable estoppel, Travelers' argument that estoppel is inapplicable because Meade's loss is not within the coverage of the Policy fails.

at 1101, and Meade, as the insured, bears the burden of establishing estoppel by clear, concise, and unequivocal evidence, *Ankus*, 674 N.E.2d at 867. Meade has met that burden here.

### i. Travelers Misled Meade.

First, Travelers communicated certain statements and took certain actions that were misleading to Meade, including expressly stating in its March 2020 Coverage Commitment Letter that: (1) Travelers "has completed its cause of loss investigation regarding the underground pipe installation;" (2) Travelers' "investigation has been unable to locate sufficient evidence to support application of the exclusions that were cited in Travelers' October 22, 2019 reservation of rights letter;" (3) "coverage will be afforded for the claimed damages subject to the terms and conditions of the policy;" (4) "[w]e are prepared to review and verify the costs associated with the claim as they become available so that payment for the covered damages may be issued;" and (5) "[t]his letter should not be construed as a waiver of any of the rights Travelers may have under the terms of your insurance policy or at law, including our right to dispute and/or exclude costs not specifically covered by your policy." (PSOF Resp. ¶72). Travelers' initial position is reinforced by its own internal statements in the Large Loss Report that "coverage is afforded for this loss" and that the "damaged pipe cannot be repaired so it can serve its intended use as a natural gas transmission line." (*Id*. ¶76).

Travelers then took things a step further when, on March 30, 2020, Travelers sent Meade an advance payment of one million dollars, followed by an additional payment in June 2020 of $2,663,266.57. And yet now, Travelers reverses course, arguing that the initial pipe "could have been used with cathodic protection," and thus should not be covered by the parties' Policy. (Dckt. #132 at 11). Given this record, Travelers' statements and actions are undoubtedly misleading.

### ii.    Meade Reasonably Relied on Travelers' Commitment to Cover Its Loss.

Meade asserts that it reasonably relied on Traveler's commitment to cover its loss that was stated in Travelers' Coverage Commitment Letter.  Travelers limits the focus of its argument against Meade's estoppel claim on this element, asserting that Meade cannot establish that it reasonably relied on Travelers' representations to its detriment because it "did not agree to perform the second installation at its own cost based on any representation by Travelers about the existence of coverage." (Dckt. #170 at 18).  Although the facts establish that Meade's installation of the new pipe was "in process" at the time that Travelers sent its Coverage Commitment Letter to Meade on March 19, 2020, (PSOF Resp. ¶72), Meade does not base its reasonable reliance argument on the theory that it received a commitment of coverage before it began to install the new pipe.

Instead, Meade asserts that it reasonably relied on Travelers' coverage commitment when it filed this lawsuit based on its understanding that the Policy covered its loss and focused exclusively on the recovery of its costs. (Dckt. #165 at 8).  The Court finds that Meade's reliance on Travelers' Coverage Commitment Letter (which expressed Travelers' commitment to cover Meade's loss, represented that it had completed its loss investigation, and further represented that there was insufficient evidence to support the exclusions stated in its initial reservation of rights letter,[9] (PSOF Resp. ¶72), was reasonable as a matter of law. *See, e.g.*, *Lumbermen's*, 890 N.E.2d at 1102–03.  Thus, although its Coverage Commitment Letter was sufficient to reserve Travelers' right to challenge the nature and amount of Meade's claimed costs, it was utterly

---

[9] Given this, Travelers "cannot rely on the earlier . . . reservation of rights letter that it sent to [Meade] notifying [it] that it would not pay for anything that was not covered under the policy; that letter does not diminish the impact of its subsequent admissions of coverage." *Lumbermen's*, 890 N.E.2d at 1103; *see also Vasilakis v. Safeway Ins. Co.*, 361 N.E.2d 1, 3 (Ill.App.Ct. 1977) (notwithstanding its reservation of rights letter, insurer waived defense of noncoverage where it subsequently undertook a course of conduct inconsistent with denial of coverage).

insufficient to place Meade on notice that Travelers reserved its right to challenge Meade's claim that the Policy covered Meade's loss. *See, e.g.*, *Standard Mut. Ins. Co. v. Lay*, 989 N.E.2d 591, 596 (Ill. 2013) ("The reservation of rights must specifically refer to the policy defense that may be asserted"); *Am. Family Mut. Ins. Co. v. Westfield Ins. Co.*, 962 N.E. 2d 993, 999 (Ill.App.Ct. 2011) (reservation of rights must "adequately inform[] of the potential policy defense"); *Royal Ins. Co. v. Process Design Assocs., Inc.*, 582 N.E.2d 1234, 1239 (Ill.App.Ct. 1991) (holding that "bare notice" is insufficient—"the notice must make specific reference to the policy defense which ultimately may be asserted."). This is particularly so given that Travelers made over $3.6 million in advance payments to Meade under the Policy.

Finally, although "a plaintiff seeking to establish estoppel cannot shut his eyes to obvious facts, or neglect to seek information that is easily accessible, and then charge his ignorance to others," *Lumbermen's*, 890 N.E.2d at 1102 (cleaned up), Meade would have had no reason to question—let alone, any ability to verify—Travelers' unequivocal representation in its Coverage Commitment Letter that it had "completed its cause of loss investigation regarding the underground pipe installation." This is so given Meade's awareness of the nature, length, and scope of Travelers' investigation. To recap, Meade provided all documentation and site access that Travelers requested during the course of the investigation; Travelers hired multiple consulting firms to assist with the investigation of the claim and paid the consultants over $100,000; Travelers investigated the circumstances of the loss for over six months before communicating its approval; and then, after doing so, Travelers made advanced payments to Meade of over $3.6 million dollars.[10]

---

[10] In view of these undisputed facts, Travelers' assertion—according to its briefing on these motions, (DSOF Resp. ¶57)—that it was continuing its investigation of the loss despite its representation to the contrary in its Coverage Commitment Letter to Meade is immaterial.

### iii.     Meade Suffered Prejudice Based on Its Reliance.

Next, Meade asserts that it has been prejudiced by "suffer[ing] the detriment of filing a suit and nearly completing discovery but later learning it needed to incur attorneys' fees to prove the heretofore conceded 'loss' and 'fortuity'" that are now "contested in a much more prolonged litigation." (Dckt. #165 at 8).  The Court finds this argument to be persuasive.  To recap, Meade filed this case on September 8, 2020 based on the presumption that its loss was covered by the Policy and that it only needed to establish that its costs were likewise covered.  Travelers filed its answer *without* pleading that there was no coverage for Meade's loss under the Policy, and the parties thereafter engaged in (and pretty much completed) written and deposition fact discovery before Travelers sought leave to file its counterclaim and first alerted Meade to its position that there was no coverage for Meade's loss.  Meade, without doubt, incurred significant attorney's fees taking discovery, drafting its requests for admission, and preparing to file for summary judgment before the scope of this litigation was expanded and discovery was reopened. Moreover, almost a year passed between the filing of the complaint and the assertion of the counterclaim.

Proceeding with this litigation with the pre-counterclaim and post-counterclaim phases of discovery resulted in inefficiencies that prejudiced Meade by causing it to unnecessarily incur attorney's fees.[11]  The Court finds that the expenditure of these unnecessary fees, combined with the almost two-year delay between Meade's filing of its claim on September 8, 2020 and Travelers' assertion of its counterclaim on August 26, 2021, and the delayed disposition of this

---

[11] Courts have found behavior to be "substantially prejudicial" to a party where the opposing party's delay caused the party to incur "unnecessary legal fees" in the preparation of discovery that was "rendered fruitless."  *See Hickman v. Fox Television Station, Inc.*, 177 Fed.Appx. 427, 429 (5th Cir. 2006); *Msefva-Mateka v. Epic Health Servs., Inc.*, No. CV H-15-1716, 2016 WL 4257315, at *4 (S.D.Tex. July 25, 2016), *report and recommendation adopted*, No. CV H-15-1716, 2016 WL 4247032 (S.D.Tex. Aug. 11, 2016).

lawsuit on account of Travelers' belated assertion of its counterclaim, has caused prejudice to Meade. *See Vasilakis*, 361 N.E.2d at 3–4 ("While a long delay in asserting a policy defense or disclaimer is normally not enough to constitute an estoppel or waiver, such delay is an important factor to be considered where there is evidence of prejudice. The length of delay is an element in determining the reasonableness or fairness of the insurer's conduct towards the insured.").

In sum: the Court finds that the above undisputed facts would lead a reasonable mind to only one conclusion: namely, that Travelers is estopped from now denying coverage for Meade's loss based upon the arguments that it asserts in its counterclaim. *See Lumbermen's*, 890 N.E.2d at 1102 (insurer estopped from raising the defense of noncoverage for a certain time frame after it represented to the insured she would be covered and she acted in reliance upon those representations in authorizing remediation work to begin on her house); *Vasilakis*, 361 N.E.2d at 4 (finding estoppel where the facts indicated "that defendant waited until suit was brought against it to deny coverage."); *Cassidy v. Luburich*, 364 N.E.2d 315, 318 (Ill.App.Ct. 1977) ("The conduct of the insurer induced . . . a reasonable belief that [plaintiff's] claim would be settled without suit and such conduct by the insurer constituted a waiver by estoppel to raising the defense of the statute of limitations.").

### B. There Is a Material Factual Dispute Regarding the Amount of Damages Owed to Meade Under the Policy.

The parties' remaining dispute concerns the value of Meade's claim under the Policy. Meade asserts that it is entitled to recover the remaining amount of the Policy's $10 million limit (or, $6,472,876.18) plus an unspecified amount for "soft cost" coverage. (Dckt. #165 at 20). Moreover, Meade asserts that it is, at a minimum, entitled to recover the amount of $2,470,932.99, which is the amount that one of Travelers' consultants (Zimmer) determined was a recommended replacement cost value based on how Travelers contends valuation should be

22

calculated ($6,134,199.56) less the amount of Travelers' advanced payments to Meade ($3,663,266.57). (*Id.* (citing PSOF Resp. ¶119)). For its part, Travelers asserts that Meade is not entitled to recover the remainder of the Policy's limit, and it suggests that Meade's recovery could be limited to $250,000 in "Additional Coverage" under the Policy. (Dckt. #170 at 24).

The parties' briefs devote the majority of their focus to issues concerning Travelers' liability and neither side has persuasively established that its position as to damages is correct as a matter of law. The Court further notes that Meade's estoppel claim does not apply to the calculation of the value of its claim under the Policy because Travelers expressly reserved its "right to dispute and/or exclude costs not specifically covered by [the] policy." (PSOF Resp. ¶72). Moreover, Meade cites no authority in support of its suggestion that Travelers is bound to its consultant's recommended replacement cost value as a matter of law and it has not placed a value on the "soft costs" that it seeks to recover. Ultimately, the Court agrees with Travelers and finds that the question of the value of Meade's claim must be determined through settlement or at trial. Accordingly, neither party is entitled to summary judgment on this issue

## CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment, (Dckt. #129), is granted in part and denied in part, and defendant's motion for summary judgment, (Dckt. #128), is denied.

**Date: March 26, 2026**

**Jeffrey I. Cummings**
**United States District Court Judge**

23